**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000046
10-MAR-2025
08:01 AM
Dkt. 150 MO**

NOS. CAAP-19-0000046 and CAAP-23-0000722

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

**CAAP-19-0000046**
NORDIC PCL CONSTRUCTION, INC., f/k/a NORDIC
CONSTRUCTION, LTD., Plaintiff-Appellee,
v.
LPIHGC, LLC; FIDELITY AND DEPOSIT COMPANY OF MARYLAND; and
MAUI BEACH RESORT LIMITED PARTNERSHIP, Defendants-Appellants,
and LEDCOR INDUSTRIES (USA) INC., Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CC181000689)

and

**CAAP-23-0000722**
IN THE MATTER OF THE ARBITRATION OF NORDIC PCL
CONSTRUCTION, INC. f/k/a NORDIC CONSTRUCTION, LTD.,
Claimant-Counterclaim Respondent-Appellant,
v.
LPIHGC, LLC, Respondent-Counterclaimant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CSP-23-0000427)

**MEMORANDUM OPINION**
(By: Hiraoka, Presiding Judge, Wadsworth and Nakasone, JJ.)

**LPIHGC**, LLC and **Nordic** PCL Construction, Inc. (formerly
known as Nordic Construction, Ltd.) had a dispute about Nordic's
performance of a **Subcontract** for concrete work on a construction
project. LPIHGC withheld payments under the subcontract. Nordic
applied for a mechanic's lien. The project's **Owner**, Maui Beach

Resort Limited Partnership, posted a **Bond** from Fidelity and Deposit Company of Maryland (**Surety**), and the mechanic's lien case was dismissed.

LPIHGC and Nordic arbitrated their disputes. An arbitrator made an award for LPIHGC against Nordic. The award was vacated, and rearbitration before a new arbitrator was ordered.

During the second arbitration, Nordic sued LPIHGC, Owner, and Surety for a declaration that the Bond remained in force. The defendants moved to dismiss. The Circuit Court of the First Circuit denied the motion but certified its ruling for interlocutory appeal.[1] The **Order Certifying Interlocutory Appeal** was entered on January 9, 2019. LPIHGC, Owner, and Surety's appeal created CAAP-19-0000046.

Meanwhile, a second arbitrator made an **Interim Award** and a **Final Award**. The Circuit Court of the First Circuit granted LPIHGC's motions to confirm the awards and denied Nordic's motions to vacate or modify the awards. The **Final Judgment** was entered on December 1, 2023.[2] Nordic's appeal created CAAP-23-0000722.

We consolidated the appeals because CAAP-19-0000046 could become moot depending on how we decide CAAP-23-0000722. In CAAP-23-0000722, we affirm the December 1, 2023 Final Judgment entered in JIMS No. 1CSP-23-0000427. We dismiss CAAP-19-0000046 as moot.

## I. BACKGROUND

These cases have a history going back seventeen years. Owner was building **Honua Kai**, a luxury condominium on Maui. See In re Nordic PCL Constr., Inc. v. LPIHGC, LLC, 136 Hawaiʻi 29, 358 P.3d 1 (2015) (**Nordic I**). Nordic did the concrete work.

---

[1]    The Honorable Dean E. Ochiai presided.

[2]    The Honorable John M. Tonaki presided.

LPIHGC found Nordic's work unacceptable.  As summarized by the second person to arbitrate the dispute:

> The nature of the dispute centers around Nordic's performance of the finish quality for concrete form and flat work to achieve a desired smooth, flat and level criterion for the mat slab, elevated slabs, walls, columns, lanais, soffits and exterior formed surfaces.
>
> In the demand for arbitration, Nordic claims and alleges that it properly performed all the work that it was obligated to perform in accordance with its Subcontract and is therefore entitled to payment in full plus the payment of a bonus.
>
> In its counterclaim, [LPIHGC] alleges that Nordic breached the Subcontract by failing to fully perform and complete its contractual obligations to properly finish the concrete surfaces, thereby resulting in [LPIHGC] incurring costs to hire and pay third-party remedial contractors to fix and complete Nordic's contractual obligations.  [LPIHGC] further asserts that it incurred other related expenses and compensable delay in the completion of the Project caused by Nordic's breach of the Subcontract.

After LPIHGC made only partial payment under the Subcontract, Nordic applied for a mechanic's lien (the **Mechanic's Lien Case**).  Surety issued the Bond.  Owner posted the Bond under Hawaii Revised Statutes (**HRS**) § 507-45.  The Mechanic's Lien Case was dismissed on December 30, 2008.  See Nordic Constr. Co. v. Maui Beach Resort Ltd. P'ship, No. 30151, 2010 WL 1434304, at *1 (Haw. Apr. 8, 2010) (Order) (**Maui Beach I**).

The Subcontract provided for arbitration of disputes.  Nordic and LPIHGC arbitrated.  During the arbitration, Owner moved to discharge the Bond in the Mechanic's Lien Case.  A circuit court denied the motion without prejudice because the arbitration was pending.  See Maui Beach I, 2010 WL 1434304, at *1.

An award (the **First Award**) was made on December 15, 2010.  Nordic I, 136 Hawaiʻi at 35, 358 P.3d at 7.  LPIHGC was the prevailing party.  Shortly after that, Owner again moved in the Mechanic's Lien Case to discharge the Bond.  A circuit court granted the motion on May 16, 2011 (**Discharge Order**).  See Nordic Constr., Ltd. v. Maui Beach Resort Ltd. P'ship,

No. CAAP-18-0000659, 2019 WL 1450166, at *1 (Haw. App. Apr. 1, 2019) (Order) (**Maui Beach II**).

LPIHGC petitioned to confirm the First Award. Nordic moved to vacate it. A circuit court confirmed the award and entered a judgment for LPIHGC. Nordic appealed. In Nordic I the supreme court vacated the judgment and directed the circuit court to hold an evidentiary hearing on Nordic's claim of the arbitrator's evident partiality. 136 Hawaiʻi at 54, 358 P.3d at 26. On March 3, 2017, the circuit court entered findings of fact, conclusions of law, and an order. The court vacated the First Award and ordered a new arbitration before a new arbitrator. See In re Nordic PCL Constr., Inc. v. LPIHGC, LLC, ___ Hawaiʻi ___, ___ P.3d ___, 2024 WL 4341412, at *1 (App. 2024) (**Nordic II**), cert. granted, No. SCWC-23-0000757, 2025 WL 53242 (Jan. 9, 2025).

On November 14, 2017, Nordic moved for relief from the Discharge Order in the Mechanic's Lien Case. See Maui Beach II, 2019 WL 1450166, at *1. On February 26, 2018, a circuit court granted the motion and vacated the Discharge Order (**Order Vacating Discharge**). Id. Owner appealed. We dismissed the appeal because the Order Vacating Discharge was a final post-judgment order and Owner's notice of appeal wasn't timely filed. Id. at *2.

On May 4, 2018, Nordic sued LPIHGC, Surety, and Owner for a declaration that the Bond "is legally-binding, valid, and enforceable." LPIHGC, Surety, and Owner moved to dismiss. The circuit court treated the motion as one for summary judgment, held there were genuine issues of material fact because the Order Vacating Discharge was ambiguous, denied the motion, and certified its order for interlocutory appeal under HRS § 641-1(b). LPIHGC, Surety, and Owner filed a notice of appeal on January 17, 2019, creating CAAP-19-0000046.

Meanwhile, Nordic and LPIHGC rearbitrated their claims. Nordic claimed it was entitled to $13,005,637 as full payment under the Subcontract, plus a bonus. LPIHGC counterclaimed for

$11,141,018 in damages caused by Nordic's breach of the Subcontract.  The arbitrator made an **Interim Award** on April 6, 2023.  The Interim Award addressed "all issues submitted to the Arbitrator in this matter except reasonable attorney fees and costs."  The arbitrator concluded that Nordic materially breached the Subcontract; LPIHGC was not entitled to all of the damages it claimed and "is not entitled to withhold $2,700,007 from Nordic in labor costs budgeted but not expended by Nordic"; Nordic was not entitled to recover delay damages or an early completion bonus; and Nordic was liable for liquidated damages and premiums LPIHGC paid for the Bond.  The Interim Award stated:

> 18.    [LPIHGC] is entitled to an award in the amount of $7,197,223 under the Subcontract.  The Subcontract amount not paid to Nordic was $7,434,467.  Therefore, [LPIHGC] wrongfully withheld $237,244 from Nordic.
>
> . . . .
>
> A.    [LPIHGC] is the prevailing party in this arbitration having prevailed in its contested claim against [Nordic] in the amount of $7,197,223 while [Nordic] is entitled to recover $237,244 that was wrongfully withheld by [LPIHGC].
>
> B.    As prevailing party, [LPIHGC] is entitled to an award of reasonable attorney fees and costs to be reduced in the amount of $237,244 (credited to [Nordic]).
>
> . . . .
>
> D.    Jurisdiction is retained by the Arbitrator pursuant to the January 11, 2023 Stipulation and Order, as modified, in order to decide the remaining issue of reasonable attorney fees and costs and issue a Final Award in this arbitration.

The arbitrator made a **Final Award** on May 30, 2023.  LPIHGC's claim for fees and costs relating to the First Award was denied; its claim for fees and costs relating to the second arbitration was granted in part:

> D.    The total Final Award to [LPIHGC] is $1,937,474 ($2,174,718 in reasonable attorney fees and costs minus $237,244 credit due to [Nordic] pursuant to the Interim Award).

On June 26, 2023, LPIHGC petitioned the circuit court to confirm the Interim Award and Final Award.  Nordic moved to

5

vacate or modify the awards. The circuit court entered an order confirming both awards and denying Nordic's motions to vacate or modify. A $1,937,474 judgment for LPIHGC against Nordic was entered on December 1, 2023. Nordic filed a notice of appeal on December 11, 2023, creating CAAP-23-0000722. We consolidated the appeals.

## II. POINTS OF ERROR

In CAAP-23-0000722, Nordic contends the circuit court erred by: **(1)** failing to vacate the award of attorney fees and costs to LPIHGC; **(2)** failing to vacate the award of bond premiums as damages to LPIHGC; **(3)** failing to vacate or modify the award of damages that LPIHGC claimed for change order work it had recovered from Owner; and **(4)** failing to vacate the awards or remand to the arbitrator because the arbitrator refused to consider Nordic's rebuttal evidence.

## III. STANDARDS OF REVIEW

We review the circuit court's ruling on an arbitration award de novo. Tatibouet v. Ellsworth, 99 Hawaiʻi 226, 233, 54 P.3d 397, 404 (2002).

"Judicial review of an arbitration award is confined to the strictest possible limits, and a court may only vacate an award on the grounds specified in HRS § 658A-23 and modify or correct on the grounds specified in HRS § 658A-24." In re Hawaiʻi State Teachers Association, 140 Hawaiʻi 381, 391, 400 P.3d 582, 592 (2017) (cleaned up). Courts "have no business weighing the merits of the award." Id. at 392, 400 P.3d at 593. Parties who arbitrate assume all hazards of the process, including the risk the arbitrator "may make mistakes in the application of law and in their findings of fact." Tatibouet, 99 Hawaiʻi at 233, 54 P.3d at 404.

The construction of, and legal effect given to, an arbitration agreement is a question of law reviewed de novo.

6

Yamamoto v. Chee, 146 Hawaiʻi 527, 533, 463 P.3d 1184, 1190 (2020).

## IV. DISCUSSION

We first address Nordic's appeal from the December 1, 2023 Judgment confirming the Interim Award and Final Award made in the second arbitration.

### A. The arbitrator did not exceed his powers by awarding attorney fees to LPIHGC.

HRS § 658A-23(a)(4) (2016) requires vacation of an arbitration award if "[a]n arbitrator exceeded the arbitrator's powers[.]"  The supreme court has held that an arbitrator exceeds their powers "by deciding matters not submitted."  Mathewson v. Aloha Airlines, Inc., 82 Hawaiʻi 57, 75, 919 P.2d 969, 987 (1996) (citing Brennan v. Stewarts' Pharmacies, Ltd., 59 Hawaiʻi 207, 223, 579 P.2d 673, 681-82 (1978)).  See, e.g., Koolau Radiology, Inc. v. Queen's Med. Ctr., 73 Haw. 433, 436, 447-48, 834 P.2d 1294, 1296, 1301-02 (1992) (arbitration agreement limited scope of arbitration to determining lease values and did not give arbitrator power to decide legal issues such as statute of frauds or parol evidence rule related to alleged oral agreement); Krafchow v. Dongbu Ins. Co., 152 Hawaiʻi 248, 258, 525 P.3d 697, 707 (App. 2023) (appraiser and umpire exceeded their powers by deciding what amounts property insurer owed to insureds — which implicated coverage issues — rather than appraising value of what insureds lost because of a wildfire irrespective of insurance coverage); Nat'l Union Fire Ins. Co. v. Reynolds, 77 Hawaiʻi 490, 494, 889 P.2d 67, 71 (App. 1995) (holding, under arbitration clause of underinsured motorist policy, that arbitration on question of whether insured was "legally entitled to recover damages" is limited to determining tortfeasor's fault and amount of insured's damages, not whether underinsured motorist coverage applied under any particular circumstance).

The Subcontract's arbitration provision included this paragraph:

> (v)  Powers of the Arbitrator.  The arbitrator shall have the power to decide all Disputes submitted to arbitration hereunder in accordance with these procedures. **_The arbitrator shall not have the power to decide any Dispute that was not submitted to arbitration by the Parties_**.  The Parties agree that in any arbitration proceeding conducted under these procedures, the arbitrator **_shall apply Hawaii law_**, shall follow the terms of this Exhibit J [to the Subcontract], and **_shall only have the power to provide in the award for any remedy that would have been available to a court deciding the same matter_**, subject to the limitations and remedies contained in these procedures.

(Emphasis added.)

Nordic argues the arbitrator exceeded his powers by awarding attorney fees to LPIHGC in the Final Award, because "[a] Hawaiʻi court could not have awarded 'prevailing party' attorneys fees to a defendant found liable for a net judgment to the plaintiff."  Nordic's framing of the issue is too narrow.

HRS § 607-14 (2016) provides, in relevant part:

> In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable . . . .  The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party . . . .
>
>      . . . .
>
> The above fees provided for by this section shall be assessed on the amount of the judgment exclusive of costs and all attorneys' fees obtained by the plaintiff, and upon the amount sued for if the defendant obtains judgment.

Nordic and LPIHGC each claimed the other breached the Subcontract.  Awarding attorney fees was a "remedy that would have been available to a court deciding the same matter[.]"  Awarding attorney fees was thus within the arbitrator's power.

The Interim Award stated:

> A.    [LPIHGC] is the prevailing party in this arbitration having prevailed in its contested claim against Nordic in

8

> the amount of $7,197,223[,] while [Nordic] is entitled to recover $237,244 that was wrongfully withheld by [LPIHGC].
>
> B.   As prevailing party, [LPIHGC] is entitled to an award of reasonable attorney fees and costs to be reduced in the amount of $237,244 (credited to [Nordic]).

The arbitrator concluding that LPIHGC was the prevailing party, if wrong, was one of the "hazards of the arbitration process including the risk that the arbitrators may make mistakes in the application of law[.]" Tatibouet, 99 Hawaiʻi at 233, 54 P.3d at 404.  "A misinterpretation of law does not amount to exceeding enumerated powers[.]" Id. at 235, 54 P.3d at 406.  The arbitrator did not exceed his powers by awarding attorney fees to LPIHGC, whom he concluded was the prevailing party.  The circuit court did not err by denying Nordic's motion to vacate or modify under HRS § 658A-23(a)(4).

### B.   The arbitrator did not exceed his powers by awarding bond premiums to LPIHGC.

LPIHGC claimed $442,313 for premiums paid for the Bond. The arbitrator found and concluded:

> 153.  On August 8, 2008, Nordic filed a lien claim against the Owner to recover $8.5 million for its work to complete the Honua Kai project.  To remove the cloud on title caused by the filing of Nordic's mechanic's lien action, the GC was required by the Owner to post a bond for $17 million [as required by Haw. Rev. Stat §507-45 (1998) in twice the amount of Nordic's claim] in order to discharge Nordic's lien application on December 2, 2008.  Premiums paid by the GC for the lien discharge bond amount to $442,312, as reflected in GC-303A-D.
>
> . . . .
>
> 16.   [LPIHGC] is entitled to reimbursement for the premiums it paid to acquire lien bond discharge protection as required to discharge Nordic's lien claim in the amount of $442,312.

A court may award costs to the prevailing party. Hawaiʻi Rules of Civil Procedure Rule 54(d)(1).  Bond premiums are awardable costs. Dade v. Kuhta, 3 Haw. App. 89, 91, 641 P.2d 989, 990 (1982) (affirming award of attachment bond fee to prevailing party).  Nordic argues the arbitrator exceeded his

authority because "[a] court deciding the same matter could only have taxed these bond premiums as a litigation cost against Nordic if LPI[HGC] had been determined to be the 'prevailing party.'" (Emphasis omitted.) Whether right or wrong, the arbitrator concluded that LPIHGC was the prevailing party. The arbitrator did not exceed his powers by awarding bond premiums to LPIHGC. The circuit court did not err by declining to vacate the Final Award on that basis.

### C. Nordic did not show that the awards were procured by fraud or other undue means.

HRS § 658A-23(a)(1) (2016) requires vacation of an arbitration award if "[t]he award was procured by corruption, fraud, or other undue means[.]" Nordic argues $476,011 of the damage award was procured by fraud because:

> LPI[HGC]'s lead counsel falsely stated to the Arbitrator in closing arguments at least three times that there was no evidence in the record of any executed change order in favor of LPI[HGC] for the claimed amounts. . . . So, LPI[HGC] was essentially "double dipping" by seeking recovery against Nordic for the same amounts. The Arbitrator nevertheless made findings in his Interim Award which awarded LPI[HGC] $476,011 in damages for amounts that Maui Beach had already paid to LPI[HGC].

The arbitrator found:

> 131. The costs incurred to remediate Nordic's Scope of Work were verified by the remedial subcontractors and subsequent trades who described the efforts required to remediate Nordic's substandard work.
>
> . . . .
>
> 139. Nordic failed to provide credible evidence that remedial work was false, fraudulent, unnecessary or unreasonable.

The Interim Award didn't itemize the damage award but Nordic claims, and LPIHGC doesn't dispute, that $476,011 of the cost of work performed under the change orders was awarded to LPIHGC.

We apply a three-prong test to determine whether fraud is a basis for vacating an arbitration award:

10

> ***First***, the movant must establish the fraud by clear and convincing evidence. ***Second***, the fraud must not have been discoverable, upon the exercise of due diligence, prior to or during arbitration. ***Third***, the movant must demonstrate that the fraud had a material effect on a dispositive issue in the arbitration. . . .
>
>       . . . .
>
>       This three-prong test sets a high standard in order to deter motions that merely seek to relitigate issues that were already — or could have been — presented to the arbitrator. The test therefore preserves the parties' bargain for the judgment of an arbitrator. At the same time, it offers relief for parties whose bargain does not extend to a determination procured by fraud.

Low v. Minichino, 126 Hawai‘i 99, 107, 108, 267 P.3d 683, 691, 692 (App. 2011) (emphasis added) (citation omitted).

     **(1)** Nordic did not show by clear and convincing evidence that LPIHGC's counsel intended to defraud the arbitrator. LPIHGC's counsel submitted a declaration opposing Nordic's motion to vacate stating: "I did misspeak in my closing remarks when I said that there was no evidence that the Project Owner and the GC had executed a change order covering the $476,011 in remedial costs. . . . While I was mistaken in my closing remarks, the mistake was not willful or intentional." His declaration also explained his mistake.

     In Low we held that "perjury may constitute a basis for vacating an arbitration award." 126 Hawai‘i at 108, 267 P.3d at 692. But "it is axiomatic that the arguments of counsel are not evidence." State v. Quitog, 85 Hawai‘i 128, 144, 938 P.2d 559, 575 (1997) (cleaned up). The circuit court's order stated: "If every misstatement by counsel during closing argument was interpreted as a fraud on the court, almost every jury trial would end up in a new trial. More has to be shown than simply a misstatement or false statement about the evidence." We agree. Nordic did not satisfy the first prong.

     **(2)** Even if LPIHGC's counsel had intended to defraud the arbitrator, he didn't get away with it. Nordic caught it during closing argument. By Nordic's own description:

> During closing argument and briefs, Nordic pointed out that the parties' joint-exhibits contained change orders showing that [Owner] had already paid LPI[HGC] for the amounts it was seeking against Nordic.

Nordic did not satisfy the second prong.

**(3)** Nordic had to demonstrate that fraud had a material effect on a dispositive issue in the arbitration. After LPIHGC argued there was no evidence Owner paid LPIHGC for doing remedial work, Nordic directed the arbitrator to specific executed change orders showing Owner paid LPIHGC for that work. What the arbitrator did with this information no one knows. But the arbitrator erroneously including the change order amounts in LPIHGC's damage award was an arbitration risk Nordic assumed. Tatibouet, 99 Hawaiʻi at 233, 54 P.3d at 404. Nordic did not satisfy the third prong and has not shown that the Interim Award was procured by fraud. The circuit court did not err by denying Nordic's motion to vacate or modify under HRS § 658A-23(a)(1).

**D.  The arbitrator did not refuse to consider evidence material to the controversy to Nordic's prejudice.**

HRS § 658A-23(a)(3) (2016) requires vacation of an arbitration award if the arbitrator "refused to consider evidence material to the controversy[.]" Evidence is material to the controversy "when it has a tendency to make the existence of any fact that was of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tatibouet, 99 Hawaiʻi at 243, 54 P.3d at 414 (cleaned up) (quoting Mathewson, 82 Hawaiʻi at 78, 919 P.2d at 990); Hawaii Rules of Evidence (**HRE**) Rule 401 (defining "relevant evidence"). In Tatibouet and Mathewson the supreme court reviewed the arbitrator's formulation of the issues and the admitted evidence to determine whether the excluded evidence would have been relevant under HRE Rule 401. We do so here.

According to the arbitrator: "[LPIHGC] alleges that Nordic breached the Subcontract by failing to . . . properly

finish the concrete surfaces, thereby resulting in [LPIHGC] incurring costs to . . . fix and complete Nordic's contractual obligations." The evidence showed that Nordic agreed to provide "concrete floor finishing to specified tolerances[.]" LPIHGC agreed that flatness and levelness tolerances had to be met when the "floors are shored, but not necessarily when [the] shores are struck."

Steve **Baldridge** was the structural engineer for Honua Kai. Nordic's structural engineering expert John **Osteraas** took Baldridge's design for areas where tile flooring was specified and calculated that 40-73% of those areas would need leveling even if Nordic had poured and finished them perfectly flat and level before the shores were struck. Thus, Nordic argued, LPIHGC did not account for post-shore-removal deflection-related surface preparation when it priced its general contract and — by implication — tried to recover its loss from Nordic.

LPIHGC called Baldridge as its witness. He claimed his post-tensioned concrete slab designs never needed leveling due to deflection:

> Q. Okay. And what you're saying is that whatever the design deflection was, you believe that that was adequate to eliminate the need for any self-leveling or leveling due to deflection?
>
> A. At the level of deflections you design to, you wouldn't need self-leveling.
>
> Q. At all?
>
> A. At all.
>
> Q. Ever?
>
> A. Ever.
>
> Q. Okay. And is it your belief that for all of the post-tensioned buildings that you've designed in Hawaii, that no -- no slab leveling due to deflection was ever required?
>
> A. ***Not due to deflection. I'm sure there's been leveling on slabs that we've been involved with***.

(Emphasis added.)

Baldridge also testified he was not aware if the general contractors on his other Honolulu projects — Kōʻula, Aʻaliʻi, Aeʻo, and Victoria Place — budgeted for slab leveling to address post-tensioned slab deflection. In rebuttal, Nordic called Igor **Mokan.** LPIHGC objected. This exchange occurred:

> [ARBITRATOR]: Could you tell me what you're going to be asking him?
>
> [NORDIC'S COUNSEL]: Yes. I'm going to ask him his name. I'm going to ask him who he works for, and it's BMK. I'm going to ask what business BMK is in; and he's going to say installing flooring, finishes, and whatnot.
>
> I'm going to ask: Did BMK install any floor finishes at Koula? And he's going to say yeah. And I said: Was there any slab leveling done at Koula? He's going to say yeah. I said: Was there a slabbing allowance -- slab leveling? Yes.
>
> I mean, were you involved in it? Yes. And was the work done? Yes. And just describe briefly **what was done and what's the status of the amount**.
>
> And then I'm going to ask the same issue at Aeo, basically the same answer, same issue at Aalii.
>
> These are three projects that Mr. Baldridge says that, you know, these were among all these buildings that **never had any slab leveling issues**.
>
> And that's it. That's all I got for him. And I -- I'm not calling him as an expert. I'm calling him as a fact witness just to contradict what -- **these arguments that they made through Baldridge** that weren't in Baldridge's report, weren't in his declaration, and **are being used to falsely represent that on all his prior projects, there were no slab leveling, which is not true**.
>
> [ARBITRATOR]: **Isn't the major issue on impeachment**, as Mr. Baldridge testified, **that there was no slab allowance** for these --
>
> [NORDIC'S COUNSEL]: **Yeah**, there's no -- **because there would be no need for slab leveling** on any of these things and his knowledge --
>
> [ARBITRATOR]: Okay. **I'm going to limit the testimony to whether or not there is a slab allowance, not what happened**.

(Emphasis added.)

Baldridge did not testify there was no slab leveling on any of his projects. He said there was no slab leveling "due to

deflection." He also said, "I'm sure there's been leveling on slabs that we've been involved with." And Baldridge's claim that slab leveling due to deflection would not be needed was already contradicted by Osteraas's opinion that 40-73% of the areas where tile flooring was specified would need leveling even if Nordic had poured and finished them to be perfectly flat and level before the shores were struck.

Nordic's opening brief describes a declaration signed by Mokan as "submitted with Nordic's proffer to call Mr. Mokan as a rebuttal witness during the arbitration hearing." Mokan's declaration is dated June 27, 2023, after the April 6, 2023 Interim Award was made. The arbitrator could not have considered Mokan's declaration as an offer of proof.

Even if Mokan's declaration had been before the arbitrator, it would not have been material to whether Nordic's work met flatness and levelness tolerances when the floors were shored. Mokan's company, **BMK**, was the flooring subcontractor for Kōʻula, Aʻaliʻi, and Aeʻo. Mokan stated:

> 8.    For each of these three projects, the contractor "shot" floor elevation laser surveys ***before*** and after ***the forms and shores were removed*** to confirm or otherwise address the concrete contractor's compliance with the concrete surface tolerances for flatness and levelness applicable to its work. This took place several months before BMK did any of its work.

(Emphasis added.)

Nordic cites no evidence from the arbitration showing that flatness or levelness was measured before the shoring was removed to document Nordic's compliance with those tolerances. The arbitrator found:

> 107. [Nordic]'s December 4, 2006 proposal provided that Nordic would remediate areas that failed to meet the 3/8" gap under a 10' straightedge test based on measurements taken after the support shores were removed. It was on this basis that remedial work was performed at the GC's direction and then back charged to Nordic after Nordic failed to perform.

Nordic cites no evidence showing how much time passed between removal of the shores and performance of the straightedge tests.

Mokan's declaration also stated:

> 5. On each of these projects, part of BMK's scope of work was to prepare the floor slabs to receive the specified floor finishes by performing selective grinding of high spots and applying a "self leveling" material to low spots on the floor slabs to achieve a floor surface profile that would satisfy the floor surface tolerances for flatness and levelness required for the installation of the specified floor finishes. This work is generally referred to as "slab leveling."

The arbitrator found:

> 113. There was no gap in Division 9 that prevented Nordic from performing its obligations under the Division 3 specifications (03350). The Division 9 levelness criteria applied to Global Stone and had nothing to do with Nordic's failure to perform under Division 3. Global Stone itself had expressly subcontracted and assumed all responsibility to take all steps within its contract to receive floors delivered by the concrete finisher at the 3/8" standard and achieve compliance for any further efforts required to install finish materials under Division 9. There was no evidence that Global Stone charged for remedial work that did not fail the 3/8" gap under a 10' straightedge remedial standard agreed to by Nordic.

The work BMK performed on Kō'ula, A'ali'i, and Ae'o was akin to Global Stone's work on Honua Kai. The arbitrator did not hold Nordic responsible for the cost of Global Stone's work to further level portions of the slabs that complied with the 3/8" in 10-foot tolerance. On this record, we cannot conclude the arbitrator "refused to consider evidence material to the controversy[.]" The circuit court did not err by denying Nordic's motion to vacate or modify under HRS § 658A-23(a)(3).

### E. CAAP-19-0000046 is moot.

In Hawai'i, "mootness is an issue of justiciability[.]" State v. Hewitt, 153 Hawai'i 33, 42, 526 P.3d 558, 567 (2023). It is properly invoked when "events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions for justiciability relevant on

16

appeal — adverse interest and effective remedy — have been compromised." <u>Lathrop v. Sakatani</u>, 111 Hawaiʻi 307, 313, 141 P.3d 480, 486 (2006).

Surety issued the Bond to secure a potential judgment for Nordic against LPIHGC. <u>See</u> HRS § 507-45. The Interim Award and Final Award were for LPIHGC and against Nordic. We are affirming the circuit court's Final Judgment. There being no debt for the Bond to secure, the dispute about its continuing enforceability is moot. None of the exceptions to the mootness doctrine — "capable of repetition, yet evading review"; "public interest"; and "collateral consequences" — apply. <u>See</u> <u>Hamilton ex rel. Lethem v. Lethem</u>, 119 Hawaiʻi 1, 5, 193 P.3d 839, 843 (2008). CAAP-19-0000046 is moot and will be dismissed.

## VII. CONCLUSION

The December 1, 2023 Final Judgment entered in JIMS No. 1CSP-23-0000427 is affirmed. CAAP-19-0000046 is dismissed as moot.

DATED: Honolulu, Hawaiʻi, March 10, 2025.

On the briefs:

David Schulmeister,
Keith Y. Yamada,
Anna H. Oshiro,
Michael R. Soon Fah,
for NORDIC PCL CONSTRUCTION,
INC., f/k/a NORDIC
CONSTRUCTION, LTD.

Terence J. O'Toole,
Judith A. Pavey,
Kukui Claydon,
Paul A. Shelowitz,
Linsey M. Lovell,
for LPIHGC, LLC; FIDELITY
AND DEPOSIT COMPANY
OF MARYLAND and MAUI BEACH
RESORT LIMITED PARTNERSHIP.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Karen T. Nakasone
Associate Judge